

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*[signature]*

**United States Bankruptcy Judge**

**Signed October 28, 2011**

---

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEBORAH K. CHASTAIN, | § | Case No. 10-37341-SGJ |
| | § | Chapter 7 |
| *Debtor.* | § | |
| | § | |
| TERRY AND PATTI VAN BURKLEO, | § | |
| | § | |
| *Plaintiffs* | § | Adversary No.: 11-03164-SGL |
| V. | § | |
| | § | |
| DEBORAH K. CHASTAIN, | § | |
| | § | |
| *Defendant.* | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court held a bench trial on September 20-21, 2011 in Adversary Proceeding No. 11-3164 (Complaint Objecting to Dischargeability of Debt) and Case No. 10-37341 (Objection to

---

the Debtor's Purported Homestead Exemption). The Court has jurisdiction in these consolidated matters pursuant to 28 U.S.C. § 1334 and these are core proceedings pursuant to 28 U.S.C. § 157(b)(2) (B) & (I). The primary governing authority in these matters is 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 522(o).

Based on the evidence, including the testimony of: (a) Deborah K. Chastain ("Ms. Chastain"), the debtor and defendant, whom the court found often lacking in credibility; and (b) Patti and Terry Van Burkleo (the "Van Burkleos"), Robert Wright, Tom Beiger, Cindy Bryant Walker, and Jeff Mentzer (all of whom the court found credible), the court finds and concludes as follows. Any finding of fact that is actually a conclusion of law shall be so considered and vice versa. The court reserves the right to make other and further findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A.  Fraud in Connection with the Sale of the Rockbrook Property.

1. Debtor and Defendant Deborah K. Chastain ("Chastain") was the seller of 9022 Rockbrook, Dallas, Dallas County, Texas 75220 (the "Rockbrook Property"). Creditors and Plaintiffs Terry and Patti Van Burkleo (the "Van Burkleos") were the purchasers. In June 2006 through at least January 8, 2007, Ms. Chastain intentionally failed to disclose to the Van Burkleos certain material information concerning mold contamination that had, on previous occasions, been found to be present at Rockbrook Property. The Van Burkleos purchased the Rockbrook Property for $875,000. Contrary to the true condition of the Rockbrook Property, there was no disclosure of at least the following items:

   a) that there were two professionally prepared reports (the so-called "Provident Report" and the "CAM Report," prepared in mid-2002) that detailed mold contamination on the Rockbrook Property;

    b)    that the previous owner of the Rockbrook Property, who had sold the Rockbrook Property to Ms. Chastain (Dr. Pamela Anderson) had moved out of the Rockbrook Property because she believed the mold was so bad that she should not live there and Dr. Anderson had received hundreds of thousands of dollars of homeowner insurance proceeds for mold contamination at the Rockbrook Property in 2002;

    c)    that the mold had never since been professionally inspected by any other mold-certified professionals or remediated by any mold-certified professionals after preparation of the Provident Report and CAM Report and after Dr. Anderson's receipt of insurance proceeds (but, rather, only Ms. Chastain, her ex-husband, and some uncertified laborers had used self-help to attempt to address mold and water damage at the Rockbrook Property); and

    d)    that Ms. Chastain had been unable to obtain standard homeowners insurance on the Rockbrook Property due to the prior mold claim.

    2.    Prior to the purchase, Ms. Chastain–who sold the Rockbrook Property to the Van Burkleos without the aid of a real estate agent–provided to the Van Burkleos a Seller's Disclosure Notice that only mentioned the word "mold" one time, merely stating that "the shower pan in the up stairs [sic] front bathroom was replaced due to a leak and water penetration. Mold was detected and remediated. The infected materials were disposed of and replaced." (Pls. Ex. 10) Ms. Chastain admitted at trial that she would have wanted the details concerning Dr. Pamela Anderson's mold claims disclosed to her. The court finds the representations made by Ms. Chastain in the Seller's Disclosure Notice (and Ms. Chastain's omissions generally) to have been materially deceptive and fraudulent. Ms. Chastain knew that the mold was far more problematic than the Seller's Disclosure Notice implied (Ms. Chastain's implication being that the mold was very isolated to an area near one shower pan). Ms. Chastain knew her statements misrepresented the extent of the mold problem because she knew that the previous seller's insurance company had thought the mold justified paying a damages claim of hundreds of thousands of dollars. Ms. Chastain also knew that the mold problem was more serious than she implied, since the previous owner had sold the property to Ms. Chastain at below-lot value, for a mere $400,000.

3. Ms. Chastain intended to deceive the Van Burkleos by not disclosing critical information concerning mold, in order to obtain the Van Burkleos' money in the form of the purchase price for the Rockbrook Property. Ms. Chastain, in fact, sold the Rockbrook Property to the Van Burkleos for $875,000 (entering into the contract with the Van Burkleos less than four years after paying a mere $400,000 for the same property, when there is no credible evidence that Ms. Chastain had done anything to correctly address the mold issues). Ms. Chastain's false pretenses, false representations, fraudulent omissions, and actual fraud caused the Van Burkleos to incur damages in the amount of $199,547.85, plus pre-judgment and post-judgment interest, plus costs of suit. In addition, the Van Burkleos incurred $87,033 in reasonable and necessary attorneys' fees in connection with their fraud claim prior to Ms. Chastain filing this bankruptcy proceeding.

4. The $199,547.85 damages claim consists of: (a) the $75,000 loss on the resale of the property by the Van Burkleos, when they sold it for $800,000 approximately 18 months after buying it and after paying for professionals to inspect and remediate the mold (and with the Van Burkleos having more fulsomely disclosed the mold issues to potential buyers than Ms. Chastain did); and (b) the various expenses that the Van Burkleos incurred that they would not have, if not for purchasing the Rockbrook Property–which the Van Burkleos credibly testified they would not have done if they had known about the mold issues. Such expenses were as follows: (i) $53,463 of closing costs that the Van Burkleos incurred when they resold the Rockbrook Property 18 months after buying it; (ii) $9,272 for 2008 Property Taxes on the Rockbrook Property that the Van Burkleos paid; (iii) $7,000 of additional paid seller's costs that the Van Burkleos incurred when they resold the Rockbrook Property 18 months after buying it; (iv) $17,227 for 2007 Property Taxes on the Rockbrook Property that the Van Burkleos paid;

(v) $3,850 for non-dwellers property insurance on the Rockbrook Property; (vi) $35.85 for documented utilities incurred on the Rockbrook Property; (vii) $26,000 for documented house rent (13 months at $2,000) that Ms. Van Burkleo incurred in connection with substitute housing in Dallas for her and her son; (viii) $950 for mold testing; and (ix) $6,750 for mold remediation. (*See* Pls. Exs. 69, 35, 36, 49 & 182)

      5.      The court found to be highly credible the testimony of the Van Burkleos, that they would never have purchased the Rockbrook Property if they had known about the Provident Report and CAM Report and the insurance claim awarded to Dr. Anderson concerning mold. For one thing, the Van Burkleos have a special needs child, and the court believes the Van Burkleos did not want to take any risks that the mold might be harmful to their child's health and general welfare. For another thing, the evidence was clear and undisputed that the Van Burkleos immediately contacted Ms. Chastain when they learned about the mold from their insurance agent and immediately began pursuing rescission of the sale contract. Moreover, the Van Burkleos never moved into the Rockbrook Property and began trying to sell it (with more ample disclosures to buyers than Ms. Chastain had provided the Van Burkleos) when they realized Ms. Chastain was not going to rescind the sale.

      6.      On December 18, 2008, following the Ms. Chastain's refusal to rescind the sale contract, the Van Burkleos filed a lawsuit against the Debtor in state court based on her fraudulent actions (the "State Fraud Case"). The case came to trial on October 19, 2010. Before the trial was completed, and before the jury could issue its verdict in the State Fraud Case, Chastain filed this bankruptcy case. Therefore, the state court did not enter a judgment reflecting the amount of damages owed to the Van Burkleos.

**B.    Chastain Transferred the Sales Proceeds from the Rockbrook Property to the Cromwell Property to Avoid Paying the Van Burkleos.**

7. The credible evidence was that the sale of the Rockbrook Property to the Van Burkleos on January 3, 2007 netted Ms. Chastain $482,718.14 in cash which she deposited in her bank accounts. On or about January 19, 2007, Ms. Chastain used $72,028.39 of this amount for a down payment and closing costs on the Cromwell Property and financed the remaining purchase of the Cromwell Property with a $161,000 mortgage. The evidence clearly showed that some of the remaining $410,689.75 of cash proceeds (which became nonexempt on January 19, 2007) were used to remodel and improve the Cromwell Property (Ms. Chastain testified that about $80,000 was spent for such things as tearing out ceilings and walls, putting in sheet rock and textured walls, hardwood floors, new wiring, new air conditioning ducts, and master bedroom remodeling)–much of this during a time she was negotiating a rescission of the sale of the Rockbrook Property with the Van Burkleos. Also, later, in mid-2007, Ms. Chastain paid off her $161,000 mortgage on the Cromwell Property with some of the $410,689.75 of the sale proceeds from Rockbrook Property. The court believes the evidence was convincing that the money put into the Cromwell Property was a conversion of nonexempt property into exempt property–spent to hinder and delay the Van Burkleos and the value of Ms. Chastain's homestead in the Cromwell Property must be reduced by this amount.

## II.  CONCLUSIONS OF LAW

8. The Van Burkleos' damages claim in the amount of $199,547.85, plus pre-judgment and post-judgment interest, plus costs of suit, that the court has found is owed to the Van Burkleos by Ms. Chastain is nondischargeable, pursuant to the provisions of 11 U.S.C. § 523(a)(2)(A), in Ms. Chastain's bankruptcy case, because it is a debt that is the result of Ms. Chastain obtaining money from the Van Burkleos based upon false pretenses, false

representations, fraudulent omissions, and actual fraud concerning the condition of the Rockbrook Property.

9. The court concludes that Section 27.01(a) & (e) of the Texas Business and Commerce Code, which was the basis of the Van Burkleos claims in the State Fraud Case, applies to the Chastain-Van Burkleo transaction, in that false representations of material facts were made by Chastain in connection with the real estate sales contract, Chastain made the false representations for purpose of inducing the Van Burkleos to enter into the sales contract, and the Van Burkleos reasonably and justifiably relied on the false representations when entering into the sales contract--the Van Burkleos having credibly testified that they would not have wanted to buy the Rockbrook Property had they known the extent of the prior mold issues. Moreover, the court concludes that the Van Burkleos should be awarded as part of their non-dischargeable damages claim their reasonable attorneys' fees pursuant to Section 27.01(a) & (e). The court finds that the amount of $87,033 is a reasonable and necessary amount of attorneys' fees that should be awarded to the Van Burkleos and added onto the amount awarded of $199,547.85, plus pre-judgment and post-judgment interest, plus costs of suit, is also non-dischargeable.

10. The court also determines that under Section 522(o) of the Bankruptcy Code, the value of Ms. Chastain's interest in her homestead at 10034 Cromwell Drive, Dallas, Texas (the "Cromwell Property") should be reduced by $241,000–which the court finds to be the value of property that Ms. Chastain disposed of in the 10-year period preceding her bankruptcy petition date with the intent to hinder, delay or defraud the Van Burkleos, which property Ms. Chastain could not have exempted under Section 522 if Ms. Chastain had held the property so disposed of. Specifically, the credible evidence was that the sale of the Rockbrook Property to the Van Burkleos on January 3, 2007 netted Ms. Chastain $482,718.14 in cash which she deposited

in her bank accounts. These were the proceeds of the sale of her then-homestead. On or about January 19, 2007, Ms. Chastain used $72,028.39 of this amount for a down payment and closing costs on the Cromwell Property and financed the remaining purchase of the Cromwell Property with a $161,000 mortgage. Ms. Chastain claims the Cromwell Property to be entirely exempt as her homestead property. But, upon the acquisition of the Cromwell Property as her homestead, the remaining proceeds of the sale of the Rockbrook Property–$410,689.75–immediately **lost** its homestead protection, even though the six-month transfer period allowed under Texas law had not expired. *In re England*, 975 F.2d 1168, 1174 (5th Cir. 1992); *In re Presto*, 376 B.R. 554 (Bankr. S. D. Tex. 2007). The evidence clearly showed that some of these $410,689.75 of cash proceeds (which became nonexempt on January 19, 2007) were used to remodel and improve the Cromwell Property (Ms. Chastain testified that about $80,000 was spent for such things as tearing out ceilings and walls, putting in sheet rock and textured walls, hardwood floors, new wiring, new air conditioning ducts, and master bedroom remodeling)–much of this during a time she was negotiating a rescission of the sale of the Rockbrook Property with the Van Burkleos. Also, later, in mid-2007, Ms. Chastain paid off her $161,000 mortgage on the Cromwell Property with some of the $410,689.75 of the sale proceeds from Rockbrook Property. The court believes the evidence was convincing that the money put into the Cromwell Property was a conversion of nonexempt property into exempt property–spent to hinder and delay the Van Burkleos and the value of Ms. Chastain's homestead in the Cromwell Property must be reduced by this amount.

### # # #  END OF ORDER  # # #